**SO ORDERED: March 11, 2021.**



_____
**James M. Carr
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ITT EDUCATIONAL SERVICES, INC., *et al.*[1] ) | Case No. 16-07207-JMC-7A |
| ) | |
| Debtors. ) | Jointly Administered |
| _____ ) | |
| ) | |
| DEBORAH J. CARUSO, the chapter 7 trustee for ) | |
| the bankruptcy estates of ITT Educational Services, ) | |
| Inc., ESI Service Corp., and Daniel Webster ) | |
| College, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Adversary Proceeding No. 18-50230 |
| ) | |
| JOHN WILEY & SONS, INC., ) | |
| ) | |
| Defendant. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This adversary proceeding came before the Court for a bench trial on December 19, 2019 and February 13, 2020.

---

[1] The debtors in these cases, along with the last four digits of their respective federal tax identification numbers are ITT Educational Services, Inc. [1311]; ESI Service Corp. [2117]; and Daniel Webster College, Inc. [5980].

Plaintiff Deborah J. Caruso, chapter 7 trustee ("Trustee") for the bankruptcy estates of ITT Educational Services, Inc. ("ITT"), ESI Service Corp., and Daniel Webster College, Inc. (collectively, the "Affiliated Debtors"), appeared by counsel Meredith R. Theisen and Cassandra A. Nielsen.  Defendant John Wiley & Sons, Inc. ("Wiley") appeared by counsel Ben T. Caughey.  At the conclusion of the trial, the Court took the matter under advisement and invited the parties to submit proposed findings of fact and conclusions of law.

The Court, having reviewed the evidence presented at the trial, the *Amended Stipulations of Facts* filed by the parties on December 17, 2019 (Docket No. 34) (the "Stipulation"), and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the trial; and being otherwise duly advised, now DENIES Trustee's oral motion made at the trial for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, and enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## FINDINGS OF FACT

**A.     Parties' History and Prior Agreements.**

1.     In July 2009, ITT and Wiley entered into a *Textbook Purchasing Agreement* (the "Purchasing Agreement").  [Stipulation, ¶ 7.]

2.     The Purchasing Agreement set forth pricing terms for custom educational products (multiple products that need assembly) and provided that each invoice for such products was to be paid "Net 90 Days" from the date of invoice.  [Stipulation, ¶¶ 8-10.]

3.     The term of the Purchasing Agreement was from May 18, 2009 through May 18, 2012.  [Wiley's Ex. D5, ¶ 2.]

4.      The Purchasing Agreement provided that all undisputed invoices must be paid in accordance with the standard terms and conditions of the invoices, which shall be "Net 90 Days" from the date of invoice. [Wiley's Ex. D5, ¶ 6; Stipulation, ¶ 10.]

5.      Following the expiration of the Purchasing Agreement on May 18, 2012, ITT and Wiley did not renew the Purchasing Agreement or enter into a new fully written agreement. [Trustee's Ex. 10, response to Interrogatory No. 3 at pp. 4-5.] In 2013, ITT and Wiley attempted to negotiate an over-arching agreement to amend or replace the Purchasing Agreement, but were unable to do so. [*Id.*]

6.      On or about October 14, 2012, Wiley decreased ITT's credit line from $1,500,000 to $750,000. [Trustee's Ex. 10 at No. 3; Stipulation, ¶ 12.]

7.      In November 2014, Wiley attempted to negotiate a new contract with ITT that provided for 60-day terms, but such negotiations were unsuccessful. [Trustee's Ex. 10 at No. 3.]

8.      From and after the expiration of the Purchasing Agreement, contracts between ITT and Wiley for the purchase and sale of textbooks, instructional materials and other products (the "Goods") were formed by the exchange of orders by ITT, deliveries of ordered Goods by Wiley and the transmission by Wiley of invoices, all pursuant to the provisions of the applicable version of Article 2 of the Uniform Commercial Code ("UCC"). Generally, the UCC provides that the law of the locale of the buyer (ITT) will govern in the absence of affirmative agreement by the parties to apply the law of another state. So here it would appear that Indiana's version of the UCC (Ind. Code §§ 26-1-2-101 *et seq.*) is applicable. Pursuant to Ind. Code § 26-1-2-204 through Ind. Code § 26-1-2-207, the terms of the contracts between ITT and Wiley for purchase and sale of the Goods were generally those contained in the orders submitted by ITT and the invoices sent by Wiley.

**B.      The Transfers.**

9.      During the period May 4, 2015 through June 6, 2016 (the "Pre-Preference Period"), ITT paid Wiley a total of $1,371,941.68, satisfying 570 invoices with dates ranging from April 2, 2014 to April 11, 2016 (the "Pre-Preference Invoices").  [Trustee's Ex. 4; Stipulation, ¶ 16.]

10.     The Pre-Preference Invoices include invoices with 90-day terms, 60-day terms and perhaps other payment terms.  [Trustee's Ex. 11.]

11.     During the Pre-Preference Period, the average number of "days to pay" an invoice from the invoice date to the payment date was 85 days, with a total range of 1 to 748 days. [Stipulation, ¶ 17.]  The median and mode for the Pre-Preference Period are both 70 days from invoice date.  [Trustee's Ex. 1.[2]]

12.     During the Pre-Preference Period, 86% of the invoices ($1,074,644.09 of the total $1,371,941.68 invoiced during the Pre-Preference Period) were paid between 45 to 95 days following invoice date.  [*Id.* at pp. 1-16.]

13.     During the time period June 17, 2016 to September 16, 2016 (the "Preference Period"), ITT paid Wiley a total of $231,998.60, satisfying 36 invoices with dates ranging from April 19, 2016 to June 9, 2016.  [Trustee's Ex. 5; Stipulation, ¶¶ 2, 13.]  The range of "days to pay" during the Preference Period was 67 to 112 days.  [Stipulation, ¶ 15.]

14.     During the Preference Period, 26 invoices (a total of $27,078.63 of the $231,998.60) were paid between 67 to 90 days following invoice date.  [Trustee's Ex. 1 at p. 17.] The remaining 10 invoices (representing a total of $204,919.97 of the $231,998.60) were paid

---

[2] The data represented in Trustee's Exhibit 1 is the same data reviewed and utilized in the reports prepared by each parties' respective expert witness, as well as in the summaries and analysis prepared by Wiley referenced in the Stipulations of Exhibits.  [Stipulation, ¶ 30.]

between 102 to 112 days following invoice date, with the largest invoice of $175,749.64 satisfied 112 days after invoice date. [*Id.*] The payments (denoted below generally as "Transfers" and individually as "Transfer No. 1" through "Transfer No. 9") during the Preference Period are summarized as follows:

>    Transfer No. 1 – Check No. 1391315 in the amount of $314.38 satisfied the underlying invoices 90 days following the invoice date.
>
>    Transfer No. 2 – Check No. 1392007 in the amount of $4,063.09 satisfied the underlying invoices between 84 to 85 days following the invoice date.
>
>    Transfer No. 3 – Check No. 1393081 in the amount of $5,375.56 satisfied the underlying invoices 84 days following the invoice date.
>
>    Transfer No. 4 – Check No. 1393983 in the amount of $4,163.02 satisfied the underlying invoices between 81 to 83 days following the invoice date.
>
>    Transfer No. 5 – Check No. 1395852 in the amount of $7,337.47 satisfied the underlying invoices between 102 to 103 days following the invoice date.
>
>    Transfer No. 6 – Check No. 1397360 in the amount of $4,887.33 satisfied the underlying invoices 83 days following the invoice date, except for the portion applied to Invoice No. 4695609 in the amount of $1,761.49 which was paid 105 days following the invoice date.
>
>    Transfer No. 7 – Check No. 1399514 in the amount of $7,634.85 satisfied the underlying invoices between 82 to 83 days following the invoice date.
>
>    Transfer No. 8 – Check No. 1400167 in the amount of $1,495.32 satisfied the underlying invoices 81 days following the invoice date.
>
>    Transfer No. 9 – Check No. 1400925 in the amount of $196,727.58 satisfied the underlying invoices 112 days following the invoice date, with the largest being Invoice No. 3776170 in the amount of $175,749.64.

[Stipulation, ¶¶ 19-27.] All of the invoices satisfied by the Transfers indicate that the credit/payment term applicable is "Net 90 Days". [Wiley's Group Ex. D4.]

15.     During the Preference Period, Wiley issued certain invoices with respect to Goods shipped after receipt of some or all of the Transfers that were not paid and remained unpaid as of the Petition Date, resulting in a new value credit of $8,827.28 (the "New Value"). [*Id*. at ¶¶ 4-5.]

**C.     Bankruptcy and Adversary Proceeding.**

16.     On September 16, 2016 (the "Petition Date"), the Affiliated Debtors filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code ("Bankruptcy Code").  Trustee was appointed interim trustee in each of the Affiliated Debtors' bankruptcy cases on the Petition Date, and in accordance with Bankruptcy Code § 702(d), became the permanent case trustee on November 1, 2016 following the conclusion of the meeting of creditors held pursuant to Bankruptcy Code § 341(a).

17.     On August 13, 2018, Trustee initiated this adversary proceeding against Wiley seeking to avoid the Transfers, in part, pursuant to Bankruptcy Code § 547.

18.     Wiley operates in the book publishing industry with a North American Industry Classification System ("NAICS") code of 511130.  [Trustee's Ex. 10 at No. 20.]  No other evidence was presented at trial regarding any alternative industry classification.

19.     Pursuant to data from Risk Management Association ("RMA"), the low average "days to pay" during the Preference Period[3] for NAICS Code 511130 was 26 days and the high average was 79 days.  The RMA data encompasses 74 reporting companies within the relevant NAICS Code.  [Trustee's Ex. 7.]

---

[3]     Trustee's Ex. 7 is titled "2017-18 Annual Statement Studies".  Testimony established that the year covered by the annual statement starts on April 1 and runs through the following March 31. [Trial Tr. vol 2, 15:13-15.] Accordingly, Trustee's Ex. 7 appears to be for the period April 1, 2017 through March 31, 2018, which does not include the Preference Period.  None of the parties challenged the date of this report as inaccurately reflecting the data in Finding of Fact ¶ 19 for the Preference Period, so the Court will consider this data applicable to the Preference Period.

20.     RMA receives and calculates its data from balance sheets, income statements, cash flow statements, and other information provided by its members in varying industries. [Trial Tr. vol 2, 40:14-19.]

21.     The typical credit terms extended by vendors within NAICS code 511130 are 1% 10 Days, Net-30 days from invoice date. [Trustee's Ex. 3.]

22.     Wiley belongs to the National Association of Credit Management and reports general aging of its accounts to third party sources. [Trial Tr. vol 1, 45:23-25.]

## **CONCLUSIONS OF LAW**

A.     To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

B.     The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

C.     This adversary proceeding was commenced pursuant to Bankruptcy Code §§ 502, 547, 548[4] and 550 and Fed. R. Bankr. P. 3007 and 7001.

D.     Each count of this adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2).

E.     Trustee and Wiley have consented to entry of final orders or judgment by the Court.

---

[4]     On December 17, 2019, the parties stipulated to the dismissal of Count II (Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. § 548 (Docket No. 35).

A.       **Preference Law and the Ordinary Course of Business Defense.**

F.       A bankruptcy trustee may seek to avoid payments made to a creditor during the 90-day period before a debtor files bankruptcy as avoidable preference payments.  *See* Bankruptcy Code § 547(b).  The purpose of Bankruptcy Code § 547(b) is to "promote equality of distribution among all creditors while simultaneously [deterring] creditors from 'racing to the courthouse to dismember the debtor during [his] slide into bankruptcy'".  *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 641 (7th Cir. 2003) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527 (1991)).

G.       To recover the amount of a payment as a preference, it must be proved that the payment was:  (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while debtor was insolvent; (4) made on or within 90 days before debtor filed its bankruptcy petition; and (5) enabled the creditor to receive more than it would have received had debtor not made the payment.  Bankruptcy Code § 547(b); *Energy Coop., Inc. v. Socap Int'l, Ltd. (In re Energy Coop., Inc.),* 832 F.2d 997, 999-1000 (7th Cir. 1987).

H.       Trustee has the burden of proving the first, second, fourth and fifth elements by a preponderance of the evidence.  Bankruptcy Code § 547(g); *In re Prescott*, 805 F.2d 719, 726 (7th Cir. 1986).  As to the third element (insolvency), ITT is presumed as a matter of law to be insolvent during the 90 days prior to the Petition Date.  Bankruptcy Code § 547(f); *Barash v. Pub. Fin. Corp.*, 658 F.2d 504, 507 (7th Cir. 1981).  This presumption is not conclusive and may be rebutted by Wiley, but the burden of proof remains with Trustee.  *See Matter of Taxman*

*Clothing Co., Inc.*, 905 F.2d 166, 168 (7th Cir. 1990); *Steege v. Affiliated Bank/North Shore Nat'l (In re Alper-Richman Furs, Ltd.)*, 147 B.R. 140, 153 (Bankr. N.D. Ill. 1992).

  I.  Here, the parties have stipulated that the Transfers constitute preferential transfers within the meaning of Bankruptcy Code § 547(b). [Stipulation, ¶ 3.] However, Wiley asserts the subjective and objective ordinary course of business defenses pursuant to Bankruptcy Code § 547(c)(2).

  J.  Bankruptcy Code § 547(c)(2) establishes two (2) different prongs of the ordinary course of business defense. First, the "subjective prong," found in § 547(c)(2)(A), requires an analysis of whether the preferential transfers were "made in the ordinary course of business or financial affairs" of ITT and Wiley. Second, the "objective prong," found in § 547(c)(2)(B), requires an analysis of whether the preferential transfers were "made according to ordinary business terms".

  K.  The creditor asserting an ordinary course of business defense to preference liability must prove by a preponderance of the evidence every element necessary to establish the defense. Bankruptcy Code § 547(g) ("[A] creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c)"); *see also Kepler v. Sec. Pac. Hous. Servs. (In re McLaughlin)*, 183 B.R. 171, 175 (Bankr. W.D. Wis. 1995) (defendant has burden of proof to establish the existence of an exception to the trustee's preferential avoidance power).

  L.  With respect to all but one of the Transfers, the parties seem to be mis-directed in their application of the ordinary course of business defense as a result of Wiley's response to one of Trustee's interrogatories. Wiley answered Trustee's Interrogatory No. 3 as follows:

> … to be more consistent with [Wiley's] credit policies and goals at such time, [Wiley] made an internal business decision that all new accounts that had been

> opened since the original contract expiration occurred [sometime in 2014] would be provided with standard 30-day terms. While [Wiley] believes that certain employees of ITT at such time may have had a belief that they were bound by 60-day terms, [Wiley] did not internally modify any of [ITT's] accounts to match any payment practice of [ITT].

Based on this response, both Wiley and Trustee assume that all of the Transfers took place beyond the credit payment terms extended by Wiley to ITT. However, each of Wiley's invoices issued to ITT with respect to the Transfers indicates that the credit/payment term applicable is "Net 90 Days". [Wiley's Group Ex. D4.] Under the UCC, it is Wiley's invoice, not the contemporary or later understanding or assumption of Wiley personnel (including the Wiley representative(s) who provided the response to Trustee's Interrogatory No. 3), that establishes the credit/payment term for each purchase and sale of Goods that resulted in the Transfers. As such, Transfer No. 1, Transfer No. 2, Transfer No. 3, Transfer No. 4, part of Transfer No. 6 ($3,125.84), Transfer No. 7 and Transfer No. 8 were all made within the payment/credit terms applicable to the Transfers. The Court concludes that all of those Transfers (Nos. 1, 2, 3, 4, part of 6, 7 and 8) were therefore made within the ordinary course of business between Wiley and ITT and may not be avoided by Trustee.

M. The Court therefore focuses on Transfer No. 9, Transfer No. 5 and the remaining part of Transfer No. 6. As Transfer No. 9, ITT sent to Wiley check number 1400925 in the amount of $196,727.58. The check cleared on August 15, 2016 to satisfy certain invoices (including number 3776170 in the amount of $175,749.64) within 112 days after Wiley issued the invoices. [Stipulation, ¶¶ 2, 27.] As Transfer No. 5, ITT sent to Wiley check number 1395852 in the amount of $7,337.47. The check cleared on August 29, 2016 to satisfy certain invoices within 102 or 103 days after Wiley issued the invoices. [*Id.* at ¶¶ 2, 23.] As Transfer

No. 6, ITT sent to Wiley check number 1397360. That check cleared on August 15, 2016 and part of the check ($1,761.49) satisfied an invoice 105 days after Wiley issued it. [*Id.* at ¶¶ 2, 24.] Therefore, a total of $205,826.54 was paid by ITT that constitute Transfers outside the credit/payment terms between Wiley and ITT (hereafter referred to as the "Late Payments").

        N.       The Court will therefore analyze whether any of the Late Payments should be considered as subject to Wiley's ordinary course of business defenses.

        **(i)**       **<u>Wiley's Subjective Ordinary Course of Business Defense.</u>**

        O.       The subjective ordinary course of business defense requires an analysis of "whether the payments the debtor made to the creditor *during* the preference period are consistent with the parties' practice *before* the preference period." *Unsecured Creditors Comm. of Sparrer Sausage Co., Inc. v. Jason's Foods, Inc.*, 826 F.3d 388, 393 (7th Cir. 2016) (citing *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993). There is no precise legal test for the subjective ordinary course defense. *Sparrer*, 826 F.3d at 393 (citing *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991) (quoting *In re Fulghum Constr. Corp.*, 872 F.2d 739, 743 (6th Cir. 1989)).

        P.       The subjective ordinary course analysis "generally entails using the debtor's payment history to calculate a baseline for the companies' dealings and then comparing preference-period payments to that baseline". *Sparrer*, 826 F.3d at 393 (citing *Kleven*, 334 F.3d at 642-43). This analysis places a particular importance on payment timing. *See AFA Inv. Inc. v. Dale T. Smith & Sons Meat Packing Co. (In re AFA Inv. Inc.)*, No. 12-11127, 2016 Bankr. LEXIS 741, at *11 (Bankr. D. Del. March 9, 2016) (internal citation omitted).

        Q.       "Bankruptcy courts typically calculate the baseline payment practice between a creditor and debtor in one of two ways: the average-lateness method or the total-range method.

The average-lateness method uses the average invoice age during the historical period to determine which payments are ordinary, while the total-range method uses the minimum and maximum invoice ages during the historical period to define an acceptable range of payments." *Sparrer*, 826 F.3d at 395. "Most courts tend to use the range of terms that define the transaction, rather than considering only averages." *Moltech Power Sys., Inc. v. Tooh Dineh Indus., Inc. (In re Moltech Power Sys., Inc.)*, 327 B.R. 675, 681 (Bankr. N.D. Fla. 2005); *see also Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 399 (Bankr. S.D. Ohio 1998); *Gonzales v. DPI Food Prods. Co. (In re Furrs Supermarkets, Inc.)*, 296 B.R. 33, 44 (Bankr. D. N.M. 2003). In addition, courts place significant emphasis on whether payments were late in determining whether they are ordinary. *Davis v. Clarklift-West, Inc. (In re Quebecor World (USA) Inc.)*, 518 B.R. 757, 765 (Bankr. S.D.N.Y. 2014) ("[C]ourts have articulated that late payments alone are 'presumptively nonordinary' and that this presumption may be rebutted only through showing that such late payments 'were the standard course of dealing between the parties.'") (internal citations omitted).

   R. The Late Payments were not made in the ordinary course of business as between Wiley and ITT. The Court concludes that Wiley has failed to meet its burden of proof as to the Late Payments under the subjective prong of the ordinary course of business defense.

   S. Pursuant to Fed. R. Evid. 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: . . . (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Moreover, a court "must consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported

speculation"; and it "must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998) (internal citations omitted). The ultimate decision as to whether a proffered expert witness is qualified remains with the Court. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999).

T. The Court concludes that Wiley's proffered expert witness, Mr. Douglas Derringer, is less qualified to render a credible opinion regarding the subjective prong of the ordinary course of business defense than Trustee's expert.

U. Trustee's expert witness, Mr. Harold Schaeffer, is qualified to provide evidence regarding the subjective ordinary course of business defense given his training, experience, and familiarity with bankruptcy preference law as well as his familiarity with the standards in calculating the subjective ordinary course of business defense. *See* Fed. R. Evid. 702. Specifically, Mr. Schaeffer testified regarding the calculation of the proper baseline and the subjective ordinary course of business defense in conformity with established law. [Trial Tr. vol 2, 32:24-35:18; Trustee's Exs. 1, 3-5.] *See Sparrer*, 826 F.3d at 393.

V. Mr. Schaeffer's testimony, and the Expert Analysis and Opinion Report, comports with the controlling law which aims to present an "accurate representation" of the parties' actual dealings prior to a bankruptcy filing. *See Moltech*, 327 B.R. at 684; *see also Eggmann v. Millwork Prods., LLC (In re Landreth Lumber Co.)*, No. 10-cv-282-MJR, 2011 U.S. Dist. LEXIS 30614 (S.D. Ill. March 23, 2011).

W. Here, the parties have agreed that the Pre-Preference Period is May 4, 2015 through June 6, 2016. [Stipulation, ¶ 16.] *See Sparrer*, 826 F.3d at 394 ("Calculating the baseline payment practice between two companies requires identifying a historical period that

reflects the companies' typical payment practices.") (citing *In re Quebecor World (USA), Inc.*, 491 B.R. 379, 387 (Bankr. S.D.N.Y. 2013)).

   X. The range of data during the Pre-Preference Period evidences the presence of substantial outliers which might skew the data.  Here, with the inclusion of such outliers, calculation of a standard deviation of the Pre-Preference Period yields a result of 65 days, presenting an inaccurate portrait of the parties' typical dealings.  [Trial Tr. vol 2, 31:25-32:5; Trustee's Ex. 4.]  Such outliers must be removed from the calculation in order to accurately portray the parties' actual ordinary course of business.  *See Moltech*, 327 B.R. at 681.

   Y. Upon removal of outliers which skew the data, the average number of "days to pay" an invoice during the Pre-Preference Period becomes 70 days with a standard deviation of 9 days and therefore a payment range of 61 days to 79 days.  [Trial Tr. vol 2, 35:14-18; Trustee's Ex. 4.]

   Z. The Court concludes a payment range of 61 days to 79 days accurately reflects, and is consistent with, the parties' typical payment practices during the Pre-Preference Period. [Trustee's Exs. 3-5.]

   AA. Applying such range to the Transfers yields the conclusion that the Late Payments are unprotected by the subjective ordinary course of business defense.  Wiley failed to meet its burden of proof as to the subjective prong of the ordinary course of business defense with respect to the Late Payments.

   BB. The Court does not find merit in Wiley's assertion that the baseline between the parties should be developed around the alleged 90-day payment term.  "[P]ayments substantially delayed beyond the due date are not in the ordinary course of business."  *See Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y.

2006). The $196,727.58 paid during the Preference Period, 22 days past the 90-day term, constitutes a substantial delay. Wiley's "substantial delay" analysis is flawed because it does not take into account the shorter payment practice (*i.e.*, payment required in less than the 90-day term) established by the parties' course of dealings during the Pre-Preference Period. A review of the transactions in the Pre-Preference Period establishes that ITT's payment practices deviated from the terms of the expired Purchasing Agreement—likely because ITT was under the belief that the payment terms were 60-days. *See Tolona*, 3 F.3d at 1032 (finding a different ordinary course range when "parties have established a practice that deviates from the strict terms of their written contract").

CC.    In addition, the Court does not find merit in Wiley's assertion that the timing of the large payment during the Preference Period is consistent with the timing of other large payments during the Pre-Preference Period. During the Pre-Preference Period, of the 197 invoices totaling $896,143.31 that were paid, 89% (totaling $672,248.49) were paid between 67 to 85 days following invoice date, with 11% (totaling $223,894.82) paid between 94 to 483 days following invoice date. During the Preference Period, there was a single large payment of $196,727.58 that satisfied 8 invoices. Unlike the large payments made during the Pre-Preference Period, only 38% of the invoices (totaling $906.57) paid with the large payment during the Preference Period were paid between 67 to 69 days following invoice date, with 63% ($195,821.01) paid 112 days following invoice date. As such, the Court concludes that there was a significant change in ITT's payment pattern during the Preference Period.

        **(ii)    Wiley's Objective Ordinary Course of Business Defense.**

DD.    To establish an objective ordinary course defense, a defendant must demonstrate the transfer(s) at issue were made within "ordinary business terms" within its industry. *See Fiber*

*Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 220 (3d Cir. 1994) (relying on *Tolona*, 3 F.3d at 1029); *see also AFA Inv. Inc.*, 2016 Bankr. LEXIS 741, at *13.  This inquiry requires a defendant "to come forward with credible evidence that the transfer[s] under consideration conformed to business terms common to the industry or to generally accepted business practices."  *Gresk v. Adams Removal & Hauling, Inc. (In re Am. Restoration Corp.),* No. 06-50341, 2008 Bankr. LEXIS 1388, at *8 (Bankr. S.D. Ind. April 28, 2008) (citing *In re Energy Co-op, Inc.*, 832 F.2d 997, 1004 (7th Cir.1987)).  "Proof of the parties own relationship is insufficient" and indeed the "objective requirement imposed by 11 U.S.C. § 547(c)(2)(C) [] requires reference to some external datum" rather than simple reliance upon contractual provisions or the creditor's own isolated transactions.  *In re Midway Airlines, Inc.*, 69 F.3d 792, 798-99 (7th Cir. 1995).

EE.    A creditor's evidence regarding the relevant industry and ordinary business terms "may not be vague and must be based on personal first-hand knowledge gained from exposure to the competitors' collections practices during or near the preference period.  *Midway Airlines*, 69 F.3d at 799, n.9.  General testimony …, unsupported by any specific data, is insufficient to prove 'ordinary business terms.'"  *Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 573 (Bankr. N.D. Ill. 1997) (*citing In re Midway Airlines*, 69 F.3d at 797).  Instead, a defendant asserting an objective ordinary course of business defense "must introduce evidence of its competitors' accounts receivable and collections practices and also of the actual payment practices of its competitors' customers."  *Id.*

FF.    Despite admitting the relevant industry for purposes of the ordinary course of business is that of "Book Publishers", codified under the NAICS Code 511130, Wiley nevertheless argues that the Late Payments must be viewed under a lens for custom educational

content with specific and, therefore, differing industry terms. [Trustee's Ex. 3 at No. 20; *Defendant's Pre Trial Brief*, pp. 16-18 (Docket No. 38).]

GG.     The Court acknowledges the testimony and relative experience of Patti Bull, Credit Manager with Wiley, Ellen Porter, Team Leader with Wiley, and Mr. Derringer, as well as the evidence presented in support of Wiley's defense.  However, it nevertheless finds that Wiley failed to introduce credible, external evidence of practices within the industry and therefore failed to prove by a preponderance of the evidence that the Transfers are protected by the objective ordinary course of business defense.

HH.     Although citing review of Wiley's competitors' terms in his report, the evidence before the Court establishes Mr. Derringer reviewed only retail and wholesale terms of competitors.  [Trial Tr. vol 1, 136: 10-23.]  Moreover, these terms did not correspond to either the Pre-Preference Period or the Preference Period.  Instead, the reviewed terms were those controlling in *2018*, nearly two years after the Petition Date.  [Trial Tr. vol 1, 139:23-140:3.]

II.     Mr. Derringer testified to his extensive experience in the publishing industry given his work with Pearson Education.  [Trial Tr. vol 1, 120:2-25.]  Despite his extensive experience, Mr. Derringer has no actual knowledge of Wiley's competitors' terms with respect to custom educational product, relying upon conjecture that Net-90 day terms govern within the alleged subset industry.  [Trial Tr. vol 1, 128:9-24; Trial Tr. vol 1, 142:19-24.]

JJ.     Derringer's testimony fails to comport with Wiley's burden to present "personal first-hand knowledge gained from exposure to the competitors' collections practices during or near the preference period," and does not provide the Court with objective evidence regarding Wiley's alleged "industry" or whether the payments here were made according to ordinary business terms of similarly situated members. *Schwinn*, 205 B.R. at 573.

KK.　　Further, the Court notes the varying terms for custom educational product utilized by Wiley's competitors, including Elsevier on 30-, 45- and 60-day terms [Trustee's Ex. 18], Cengage on both 30- and 60-day terms [Trustee's Exs. 14-17], Pearson on 60-day terms [Trustee's Ex. 13], and Wiley on 60-day, 90-day and perhaps other payment terms [Trustee's Ex. 11.] Such inconsistency falls far short of establishing industry terms are "more likely than not" Net 90-days, and Wiley therefore fails to bear its burden by preponderance of the evidence. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 542 (7th Cir. 2006).

LL.　　The Court concludes that Trustee's position, and that of her expert, Mr. Schaeffer, is more credible with respect to the relevant industry and its corresponding standards. Specifically, Mr. Schaeffer possesses over 40 years of experience in credit management, having served in various capacities throughout his career in the evaluation of credit terms and is therefore well qualified to provide expert testimony with respect to industry standards for purposes of the objective ordinary course of business. Fed. R. Evid. 702. [Trial Tr. vol 2, 4:1-9:14; Trustee's Ex. 3.]

MM.　　Rather than a subcategory or subset industry with separate and distinct invoice and payment terms, custom educational publishing represents a product line within the book publishing industry. Such conclusion is consistent with the testimony provided by Mr. Derringer that "instead of being its own channel organically, it [steals] business from other parts of the business." [Trial Tr. vol 1, 106:8-13.]

NN.　　As a product line, custom educational publishing functions within the ambit of the general book publishing industry (*i.e.*, NAICS Code 511130) and therefore any differing or otherwise specialized terms are subsumed within a company's balance sheet, combined financial

statement(s), and other reportable data. [Trial Tr. vol 2, 22:11-24; Trial Tr. vol 2, 23:17-24.] The Court acknowledges such. [Trial Tr. vol 2, 27:10-16.]

OO. Accordingly, reliance on data obtained from RMA is both reasonable and appropriate for determining the relevant industry standards in this matter. *In re AES Thames, L.L.C.*, No. 11-10334, 2016 Bankr. LEXIS 4731, at *17-18 (Bankr. D. Del. Oct. 28, 2016) (finding that an expert's opinion based solely on RMA data is admissible); *Dietz v. Jacobs*, 12-1628, 2014 U.S. Dist. LEXIS 37144, at *17-18 (D. Minn. Mar. 21, 2014) (finding when an expert relied on RMA data, his opinion was admissible as to payment practices in the defendants' industry); *Blue Cross & Blue Shield of Minnesota v. Wells Fargo Bank, N.A.*, No. 11-2529, 2013 U.S. Dist. LEXIS 78018, at *10-11, *22-24 (D. Minn. June 4, 2013) (declining to exclude expert testimony that used RMA data).

PP. Here, the longer custom terms advocated by Wiley are indeed reflected within the external RMA data and are well outside industry standards and, therefore, outside of the objective ordinary course of business. *See Tolona*, 3 F.3d at 1032 ("If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony.").

QQ. Wiley has failed to meet its burden to establish the Late Payments are protected by the objective prong of the ordinary course of business defense.

## DECISION

Based on the foregoing, the Court concludes that:

(1) Wiley has established, by a preponderance of the evidence, that Transfer No. 1, Transfer No. 2, Transfer No. 3, Transfer No. 4, part of Transfer No. 6 ($3,125.84), Transfer No.

7 and Transfer No. 8 were made within the ordinary course of business between Wiley and ITT and may not be avoided by Trustee; and

   (2) Wiley has failed to establish, by a preponderance of the evidence, that the Late Payments should be protected by Bankruptcy Code §§ 547(c)(2)(A) and/or 547(c)(2)(B).

   Accordingly, the Court concludes that a total of $205,826.54, less the New Value of $8,827.28, for a total of $196,999.26 (the "Avoided Preferences") is avoidable and recoverable from Wiley by Trustee.

   As to Count IV of the Complaint, pursuant to Bankruptcy Code § 502(d), the Court concludes that unless and until such time as Wiley satisfies its obligation to pay the Avoided Preferences to Trustee, any and all claims of Wiley in ITT's bankruptcy case are disallowed.

   The Court will enter judgment in favor of Trustee and against Wiley consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #